**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James Leslie NORMAN, Defendant– Appellant.**

**No. 91–3099.**

United States Court of Appeals, Tenth Circuit.

Dec. 17, 1991.

Lee Thompson, U.S. Atty., and Gregory G. Hough, Asst. U.S. Atty., Topeka, Kan., for plaintiff-appellee.

Charles D. Anderson, Federal Public Defender, and Marilyn M. Trubey, Asst. Federal Public Defender, Topeka, Kan., for defendant-appellant.

Before HOLLOWAY, MOORE and BRORBY, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

James L. Norman appeals his sentence for making two false reports to Braniff Airlines claiming his ex-wife's suitor was aboard a Braniff plane carrying a handgun and explosives. Mr. Norman was charged with two counts of violating 49 U.S.C.App. § 1472(m) (imparting false information regarding firearms and explosives aboard an aircraft). Because there is no specific sentencing guideline for violation of § 1472(m), the district court applied the guideline for the offense of making threatening communications. The court also refused to group the two counts for sentencing purposes. We conclude the guideline which should have been applied is that for the offense of possessing dangerous weapons or materials while boarding an aircraft. We also conclude the two counts should have been grouped. We therefore reverse and remand for resentencing.

On October 7, 1988, Mr. Norman anonymously telephoned Braniff Airlines and told them Mike Benkowsky was aboard a plane in route from San Diego to Kansas City and that he was carrying a handgun and explosives. Although airport security police attempted to detain Mr. Benkowsky, the plane had already landed, and they were unable to locate him. Mr. Norman made a second anonymous call to Braniff and reported Mr. Benkowsky would be leaving Kansas City for San Diego armed with explosives.

At 9:55 a.m. on October 9, a Braniff flight left Kansas City for San Diego. While that flight was in the air, Braniff received another call stating a dangerous felon was aboard with explosives. Noting Mr. Benkowsky had purchased a ticket on that flight, Braniff officials ordered the plane to return to Kansas City where the passengers were removed and the baggage searched. Mr. Benkowsky was not aboard the plane. Because no explosives were found, the flight was resumed.

Braniff had a second flight to San Diego later that day. As the plane was preparing to take off, it was stopped by airport security. This time, the officers found Mr. Benkowsky and removed him from the plane in handcuffs. After questioning him, the officers released Mr. Benkowsky, and he returned to California.

Authorities discovered Mr. Norman's role in these events, and ultimately he was charged with two counts of violating 49 U.S.C.App. § 1472(m), to which he entered pleas of guilty. Defendant readily admit-

ted his guilt to the presentence investigator, advising him he made the calls because his former wife had entered a relationship with Mr. Benkowsky.

 We must determine whether the district court correctly applied the guidelines, given there is no specific provision for the offense to which Mr. Norman pled. Application of the guidelines is reviewed for errors of law *de novo, United States v. Banashefski*, 928 F.2d 349, 351 (10th Cir. 1991). When the issue cannot be resolved by a plain reading of the guideline in question, we will look to the Commentary and Supplemental Illustrations for guidance. *Id.*

 When a charge is not covered by the guidelines, the court must apply "the most analogous offense guideline." United States Sentencing Guidelines § 2X5.1. Although Mr. Norman pled guilty to two counts of violating § 1472(m), there is no sentencing guideline for that crime. Thus the district court was bound to find the most analogous offense upon which to base the sentence. In this instance, over the defendant's objection, the court chose to apply the guideline for the crime of "Threatening Communications," U.S.S.G. § 2A6.1. Despite the apparent similarity in the title of the statute defining the underlying crime, the substantive offense of making threatening communications has no statutory parallel to the offense of which Mr. Norman was convicted.

The offense of threatening communications, codified in 18 U.S.C. §§ 871, 876, 877, 878(a), and 879, is committed by making threats against a President, using the mail to make threats, making threats against foreign dignitaries and officials, and making threats against a former President. Mr. Norman's criminal conduct does not implicate any of these crimes. A closer parallel exists, however, between his conduct and the offense of "[c]arrying weapons, loaded firearms, and explosives ... aboard an aircraft," 49 U.S.C.App.

§ 1472(*l*), to which U.S.S.G. § 2K1.5 specifically applies.

Not only is there a factual parallel between the act of carrying a loaded firearm or explosive aboard an aircraft and Mr. Norman's criminal act, there is also a statutory affinity between the two offenses. Section 1472(m) provides:

(1) Whoever willfully and maliciously, or with reckless disregard for the safety of human life, *imparts or conveys ... false information,* knowing the information to be false and under circumstances in which such information may reasonably be believed, *concerning an attempt ... being made or to be made, to do any act which would be a felony prohibited by subsection (i), (j), (k), or (l) of this section,* shall be fined ... or imprisoned....

(emphasis added). Section 1472(*l*), included within § 1472(m), criminalizes carrying weapons aboard an aircraft. The false information conveyed by Mr. Norman was that Mr. Benkowsky was carrying a weapon and an explosive aboard an airliner. Because of these factual and statutory parallels, we believe Mr. Norman's threats are more analogous to carrying a weapon aboard a plane than to making a threat against a President, foreign dignitary, or by use of the mails. Thus, Guideline § 2K1.5, which provides the base offense level for carrying weapons aboard an aircraft is the most analogous guideline for sentencing a violation of § 1472(m).[1]

 Having concluded the district court erred in applying § 2A6.1, we must consider whether Mr. Norman is correct that the counts should be grouped for sentencing. Guideline § 3D1.2 provides:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

....

---

1. Although Mr. Norman argues § 2F1.1 should be applied, we disagree. Section 2F1.1, which applies to knowing and willful making of false statements in any matter within the jurisdiction of any department or agency of the United States, while closer to the offense of conviction than § 2A6.1, is less analogous to the offense than § 2K1.5.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

The district court did not apply § 3D1.2 because it specifically excludes "all offenses in Chapter Two, Part A." Thus, because the court applied § 2A6.1, it was logical for the court to deny defendant's request for grouping.

The district court's reasoning is no longer applicable, however. Therefore, we must review the facts and determine whether they fit within the confines of § 3D1.2(b). In doing so, we are mindful of Application Note 4 to § 3D1.2(b) which states in part: "[s]ubsection (b) provides that counts that are part of a *single course of conduct* with a *single criminal objective* and represent essentially *one composite harm to the same victim* are to be grouped together, even if they constitute legally distinct offenses occurring at different times." (emphasis added).

The government argues grouping is not proper because the acts upon which the conviction is based "occurred on two separate dates, and involved separate instances of fear and risk of harm, and therefore, are not one composite harm." Contending that Braniff Airlines was the "primary victim" of defendant's "terrorist threats," the government urges Mr. Norman's acts constituted separate risk of harm and fear to "different flights, crews and passengers." The government relegates Mr. Benkowsky to the role of "secondary victim."

Our analysis leads us to the opposite conclusion. The scheme defendant carried out was motivated by only one desire: to bring grief to Mr. Benkowsky. While the method employed was bizarre, it was surely motivated by Mr. Norman's assumption that immediate and severe consequences would befall Mr. Benkowsky if he were perceived as a threat to the airplane and its passengers. The scenario in the record indicates Braniff was merely a tool in Mr.

Norman's criminal scheme. Mr. Norman did not target the airline for harm. Indeed, it may be logically assumed that had Mr. Benkowsky chosen another carrier for his trip, that airline would have become the means by which the defendant visited his mischief upon his victim.[2]

Contrary to the government's position, we think this case is like *United States v. Wilson*, 920 F.2d 1290 (6th Cir.1990), in which the defendant made five long distance telephone calls over a period of two weeks to obtain a "hit man" to murder his wife. At the end of the two weeks, the defendant mailed a letter containing a $500 down payment to secure the deal. These transactions resulted in an indictment containing six counts of using an interstate commerce facility to attempt to have his wife murdered. The Sixth Circuit reversed the trial court's refusal to group the counts under § 3D1.3(b). The court held:

> Because the [defendant's] actions occurred over a two week period, they can not be characterized as a single act. Grouping is required, however, under subsection 3D1.2(b). The telephone calls and letter involve "two or more acts or transactions connected by a common criminal objective...."

Id. at 1294 (citation omitted). Similarly, the calls placed by Mr. Norman, albeit on separate dates, are still connected to his criminal objective of bringing harm to Mr. Benkowsky. In that vein, the Sixth Circuit stated:

> Wilson's wife is the victim of all six acts and the six acts involve the same objective: her death. The company insuring the life of Wilson's wife, for example, might have suffered harm if the murder had occurred, but it is only a secondary victim.
>
> An important objective of section 3D1.2 is to limit the significance of the prosecutor's charging decision to prevent multiple punishment where there is one victim and two or more acts in further-

---

**2.** Moreover, to the extent the passengers and crew of the flight that was intercepted were victimized, the harm that came to them was incidental. Under this circumstance, they were not victims within the meaning of § 3D1.2(b). U.S.S.G. Application Note 2, § 3D1.2.

ance of a common criminal objective. Wilson's crimes should be grouped.

Id.

We therefore conclude there was only one course of conduct (making false reports to Braniff), only one criminal objective (to harm Mr. Benkowsky), and only one composite harm to one victim (subjecting Mr. Benkowsky to arrest). We hold Mr. Norman's offenses should have been grouped. The sentences are VACATED, and the case is REMANDED for resentencing in accordance with this opinion.